## BENJAMIN MELVIN *vs.* PROPRIETORS OF THE LOCKS AND CANALS ON MERRIMACK RIVER.

Where the heirs of K. gave deeds to C. of land which they described as " the estate on which C. now lives," or " the estate called the C. farm," and " being the same which was conveyed by M. to K. by deed " bearing a certain date, and it was shown that C., as lessee of K., and otherwise, had previously occupied the whole farm for many years ; it was held that the deeds passed the right and title of the heirs to the whole farm, although the deed from M. to K., which was therein referred to, did not include the whole.

Where several persons in succession enter on land as disseizors, their several possessions cannot be tacked so as to make a continuity of disseizin of sufficient length to bar the owner's right of entry, unless there is a privity of estate, or their several titles are connected ; but where the first disseizor demises the land, and the lessee takes and keeps possession till the lessor's death, and afterwards remains in possession as tenant, either at will or at sufferance, of the disseizee, there is such a connexion of title as preserves the continuity of the disseizin.

Notorious and exclusive possession, without right, constitutes a disseizin : So does an entry under a void grant : Therefore where a demandant in a real action admits that there has been adverse possession for thirty years, he cannot set up the objection that the first entry upon him was by mistake as to the boundaries described in a deed, and, for that reason, not a disseizin.

A tenant in a real action is not estopped to set up a title by disseizin, by reason of nis having relied, as one ground of his title, upon a deed which was found not to convey the demanded premises.

A married woman, whose land is delivered up on a writ of *habere facias* issued on a judgment against her husband, may make a formal entry on the land, (if her husband does not object,) for the purpose of preventing the statute bar of her right of entry.

By *St.* 1786, *c.* 13, a married woman was barred of her right of entry, unless she made entry within thirty years next after that right accrued.

WRIT of entry, dated August 7th 1839, to recover seven acres and 142½ square rods of land in Lowell.

From the report of the case, made by *Dewey*, J. before whom the trial was had at October term 1840, it appeared that the demandant's grandfather, Thomas Fletcher, in August 1771, died seized of the demanded premises, leaving a widow, and two daughters, Rebecca and Joanna ; and that he devised the use of one third part of his real estate to his widow, while she should remain such, and the residue, with cross remainders, to his said daughters. The said Rebecca, January 9th 1773, married Jacob Kittridge, who died in 1813, and she died in 1818. Said Joanna, in 1771, married Benjamin Melvin, the demandant's father, who died in April 1830, and she died in September 1826. The widow of Thomas Fletcher died in 1798.

There were ten children of the marriage of said Jacob Kittridge and Rebecca Fletcher, and seven children of the marriage of said Benjamin Melvin and Joanna Fletcher. And the demandant introduced deeds, executed in March, May and July, 1839, by the children of said marriages, or their representatives, conveying or releasing to him all their interest in the demanded premises. All these deeds were executed and delivered on the premises therein described ; the several grantors having first made an entry, either in person or by their attorney authorized for that purpose.

The tenants objected to the sufficiency of these deeds to pass any estate to the demandant, and set up a claim to the demanded premises, under the heirs of said Jacob Kittridge. To support this claim, the tenants introduced an office copy of a deed from said Jacob, and Rebecca his wife, to Benjamin Melvin, the demandant's father, dated April 27th 1782, whereby, for the consideration of £ 300, they conveyed to him a moiety of a parcel of land in Chelmsford, (now Lowell,) formerly owned by Thomas Fletcher, which, as was admitted, included the demanded premises. The tenants also introduced an office copy of a deed of mortgage, of the same date, made by said Benjamin Melvin, and Joanna his wife, to said Jacob Kittridge, conveying to him a certain portion of the foregoing parcel, (and enclosing, as the tenants contended, the demanded premises,) to

secure the payment of £300, in five years. In the first mentioned deed, the land was described thus : " A certain piece or parcel of land, lying in Chelmsford, containing by estimation about 130 acres, be the same more or less, viz. the one half and no more, reckoning the same for quantity and quality, the whole of which was some years past owned by Thomas Fletcher, late of said Chelmsford, deceased, and is bounded as follows, viz. beginning at the county road and running southerly on land of John Tyng ; thence turning and running westerly on said Tyng's land ; thence runs southerly upon land of Andrew Fletcher ; thence runs easterly upon land of Josiah Fletcher ; thence runs southerly upon land of said Josiah ; then runs westerly upon land of said Josiah ; thence turns southerly and runs on land of said Andrew Fletcher, till it comes to the northerly part of Meetinghouse Hill, so called ; then turns easterly and runs on land of said Josiah Fletcher ; then northerly on land of said Josiah ; then turns and runs easterly on land of said Josiah ; and then runs northerly on land lately belonging to the heirs of Henry Fletcher, deceased ; then turns and runs easterly on land of said Henry Fletcher, as the same was in his life time, and still easterly on land of Jacob Spaulding, till it comes to Merrimack River ; then runs northerly on said river, till it comes to land of the aforesaid Tyng ; then turns westerly, and runs on said Tyng's land ; then northerly till it comes to said river ; then runs up said river to the Mill Landing ; and from thence on the road, until it comes to the bound first mentioned." The description, in said mortgage deed from Benjamin Melvin and wife to Jacob Kittridge, was as follows : " A certain tract or parcel, lying in Chelmsford Neck, so called, containing by estimation 100 acres, be the same more or less, lying all together in one piece, without any division, except only one county bridle road, which runs through the northerly part of said farm or tract of land, being a part of the real estate of Thomas Fletcher, late of Chelmsford, deceased, with all the buildings," &c.

The tenants then introduced one part of an indenture of lease from said Jacob Kittridge to said Benjamin Melvin, dated April

17th 1793, whereby said Jacob demised, for the term of one year from date, a farm, which was thus described : "A certain farm in said Chelmsford, lying partly upon Merrimack River, near Pawtucket Falls, and formerly belonging to Thomas Fletcher, late of Chelmsford, deceased, containing 100 acres, be the same more or less, with all the buildings thereon, it being the same farm whereon the said Benjamin Melvin now dwells. He paying to said Kittridge £10 for rent of said farm for the term of one year. The said farm is bounded, beginning at a great elm tree standing at the corner of the town way, near to Nathan Tyler's house, a little north of the barn on said farm ; from thence something westerly, southerly and easterly, by a heap of stones, as the fence now stands, to the town way at or near Josiah Fletcher's most northerly corner, to a heap of stones ; from thence southerly by the land of the late Andrew Fletcher, deceased, about 124 poles to a stake and stones by the land of Jonathan Williams ; *from thence eastwardly*" [bounding southerly] "*by said Williams's land* 40 poles to a black oak stump, with stones on it, by the land of Josiah Fletcher ; from thence northwardly by said Fletcher's land 29½ poles to a heap of stones ; thence eastwardly 8 poles to a stake and stones ; from thence northerly and easterly about 170 poles by the land that belonged to the heirs of Henry Fletcher, late of Chelmsford, until it comes to Merrimack River ; from thence up said river until it comes to land that belongs to John Tyng ; thence westerly and northerly by said Tyng's land, until it comes to said river ; and thence up said river by said landing to the end of a wall near Tyler's Mills ; thence by the town way, until it comes to the bound first mentioned, including the same."

The tenants also introduced a copy of a writ, dated November 3d 1794, and returnable to the court of common pleas held in that month at Cambridge, in which said Kittridge demanded of said Melvin possession of the land described in the aforesaid lease. The land was described in said writ precisely as in said lease ; and said Kittridge, in said writ, alleged his seizin in fee

of the premises therein described, on the day of the date of said lease. Judgment was rendered for said Kittridge for the said premises, at the April term, 1796, of the supreme judicial court held in said county of Middlesex ; and a writ of *habere facias* issued thereon, dated April 19th 1796, which was never returned.

The tenants then produced a witness, who testified that he was present, in April 1796, when an officer " ordered said Melvin's things to be put out of doors, and they were cleared out ; " and that said Kittridge, on the same day, made a lease of the farm to Moses Cheever and Thomas Thissell for one year. One part of such a lease was then given in evidence by the tenants, which was dated April 10th 1796, and contained the same description of the premises as the aforesaid lease of 1793 to Melvin — *except* that a part of the southerly boundary in said lease of 1793, viz. " from thence eastwardly by the said Williams's land, 40 poles," &c. was omitted, and no other substituted.

The tenants also produced one part of another lease from said Kittridge to said Moses Cheever, of the same farm, dated May 16th 1803, for the term of three years from the 10th of April preceding. In this lease the farm was described precisely as in the aforesaid lease of 1793 to Melvin, giving the same quantity of land, same length of lines, same courses, monuments and adjoining lands — *except* that it mentioned Nathan Tyler's land, and not Jona. Williams's, as bounding on the south. On the back of this lease was a memorandum, signed by the parties, and dated May 15th 1806, agreeing that Cheever should occupy the premises therein described for the further term of three years : Also a similar memorandum, dated April 15th 1809, for the further term of three years.

The tenants then introduced several witnesses, the sum of whose testimony was, that Moses Cheever and Thomas Thissell occupied the Thomas Fletcher farm, one year from April 1796 ; that one Wheelwright then took it for five years, the two last of which years John Blanchard occupied it with Wheelwright ; that Blanchard occupied it alone one year afterwards ; that

Wheelwright and Blanchard occupied the demanded premises as a pasture, and also for sowing rye and buckwheat thereon, in different years ; that Blanchard repaired the fence next to Tyler's land ; that Moses Cheever returned to the farm in 1803, and lived on it twenty years or more, ploughed the demanded premises, and raised rye thereon, and made half the fence next to Tyler's land ; and that during all the time while Wheelwright, Blanchard and Cheever were in possession of the farm, no other person was known to have made claim to the demanded premises.

The tenants then introduced deeds from five of the heirs of Jacob Kittridge, each conveying by deed of warranty or by release, unto Moses Cheever, one undivided tenth part of the real estate in Chelmsford, on which said Moses lived at the dates of said deeds. Also a deed to said Cheever of three undivided tenth parts of the same estate, described in the same manner, executed by Eli Forbes, as guardian of other heirs of said Jacob Kittridge. Also a quitclaim deed from John Kittridge to Eli Forbes, of one undivided tenth part of the same estate ; and a quitclaim from said Forbes to said Moses Cheever of one undivided tenth part, " in quantity and quality " of the same estate. Also a deed from Anstis Kittridge, as administratrix of the estate of Benjamin Kittridge, to Henry Rice, of seven and a half undivided one hundredth parts of the same estate, and " called the Cheever farm," and another deed from said Anstis, as administratrix, as aforesaid, to said Rice, of two and a half one hundredth parts of the same estate, and also " called the Cheever farm."

All these deeds, except that from John Kittridge to Forbes, described the land thereby conveyed as the same " estate which was conveyed by Benjamin Melvin and Joanna Melvin to Doctor Jacob Kittridge by deed dated April 25th 1782," and as " being the farm on which said Moses Cheever now lives." The deed from John Kittridge to Forbes described the land as "containing 130 acres, more or less, it being that part of the real estate formerly owned by Thomas Fletcher, that was for many years, previous to 1814, rented by Doct. Jacob Kit-

tridge." All the other deeds abovementioned, except those from Anstis Kittridge to Henry Rice, described the land as containing 100 acres, more or less, or about 100 acres, more or less. In the deeds from said Anstis to said Henry, the land is said to be " about 110 acres, be the same more or less." All the abovementioned deeds, that were *given to said Cheever*, were made in the year 1820.

The tenants also introduced two warranty deeds from said Moses Cheever to Thomas M. Clark, dated Nov. 1821, granting eight tenths of 100 acres, being the farm on which said Cheever then lived, and described as being the same that was conveyed to Jacob Kittridge by Benjamin and Joanna Melvin, April 27th 1782. Also a deed of warranty from said Cheever to Kirk Boott, dated January 1822, of one tenth of the same farm, described in the same manner. Also a quitclaim deed from said Thomas M. Clark to said Boott, of eight tenths of the same farm, and quitclaim deeds, made by said Boott to the Merrimack Manufacturing Company, of nine tenths of the same. Also a deed from Henry Rice abovementioned to said Manufacturing Company, of seven and a half one hundredth parts of the same. Also a quitclaim deed from said Manufacturing Company to the tenants, dated January 22d 1826, of nine tenths of the same ; and a quitclaim deed from said Rice to the tenants, of two and a half one hundreth parts of the same, dated December .4th 1826.

The tenants also introduced a mortgage deed from Benjamin Melvin to Jona. Williams, dated July 9th 1785, conveying 16 acres of pasture, called Speen's Brook pasture, and 16 acres of plough land bounded southerly on said pasture, with covenants that said Melvin was seized in fee of said premises, and that they were free of all incumbrances. [This mortgage, as the tenants admitted, included the premises demanded in this suit.] Also a mortgage deed from said Melvin to James Varnum, dated April 6th 1795 : Also deeds from said Melvin and wife, given in 1794, conveying that part of the land mortgaged to Williams, which lies south of the demanded premises.

The demandant—for the purpose of showing that neither

the mortgage, leases nor deeds, from the heirs of Jacob Kittridge, which the tenants had introduced, included the demanded premises, and that they were separated from the farm by a town bridle road and fence — offered the following evidence : Leases from Jacob Kittridge to Benjamin Melvin, each for one year, dated April 17th 1789, 1790, 1791 and 1792, containing the same description of the demanded premises as in the lease of 1793, which was produced by the tenants : A copy of the laying out and acceptance of a town road, in March 1737, beginning at Hunt's Ferry at the mouth of Concord River ; thence running northerly through the Neck Field, crossing Speen's Brook, &c. : A copy, from the probate office, of the appraisement of the real estate of which Thomas Fletcher died seized in fee, and the assignment of dower to his widow ; in which a town road was mentioned as a boundary : The testimony of several aged witnesses, that the aforesaid town road was commonly used and travelled before the year 1782 ; that there was a fence on one side thereof across the Fletcher farm ; and that Benjamin Melvin occupied the field south of said road up to the year 1800 and later.

The demandant also produced a copy of a writ in favor of Jona. Williams, dated Aug. 29, 1786, returnable at the following September term, wherein he demanded of said Benj. Melvin seizin and possession of the two lots of land described in the mortgage deed from Melvin to him, dated July 9th 1785, following the description in said mortgage : Also a copy of a conditional judgment for possession of the same land, rendered in favor of said Williams at the November term 1786 ; and a copy of a writ of *habere facias*, which issued on said judgment, February 16th 1787, with a return of an officer thereon, that he had, on the 10th of March 1787, given seizin and possession to said Williams of the land described in said writ : Also a quitclaim deed from said Williams to said Melvin of said two lots, dated November 24th 1794 : Also a release, dated November 7th 1795, from James Varnum to said Melvin, of the premises mortgaged to said James by deed of April 6th 1795.

The report of the judge, who tried the case, concluded thus : The facts testified to by the tenants' witnesses, so far as they

tend to show an occupancy of the demanded premises by Wheelwright and Blanchard, are to be taken as proved. Also the occupancy of the same by Cheever, since 1803, is to be taken as proved ; and it is admitted that after and ever since the deeds to the Merrimack Manufacturing Company, before mentioned, were given, the tenants have claimed and occupied the demanded premises. It is admitted that the heirs of Joanna Melvin entered upon the demanded premises in July 1832, and that they, in May 1-833, sued out writs of entry, on their own seizin, to recover the same, which were discontinued in 1835 ; that they then joined in a writ of right, which was continued in court till October term 1836, when Rufus Melvin, one of the demandants therein, executed a release of the same action to the tenants.

Upon the foregoing evidence, the tenants contended, 1st. That from the sundry leases made by Kittridge to Melvin, from 1789 to 1793, inclusive, the legal presumption was, that Kittridge had made an entry upon the land described in the leases, by virtue of his mortgage from Melvin and wife, for condition broken, and that, prior to the date of the writ against Melvin, in 1794, the mortgage had been foreclosed. 2d. That the boundaries and distances, as mentioned in the leases, must necessarily include the demanded premises. 3d. That if the leases include the demanded premises, the parties, within a few years after the date of the mortgage, when the boundaries were well known, must have fixed the extent of the land embraced in the mortgage ; and that, from 50 years' acquiescence, and more than 40 years' possession, the presumption was, that the mortgage included the demanded premises. 4th. That if neither the leases nor the mortgage included the demanded premises, yet the entry by Kittridge in 1796, and his ejectment of Melvin and his wife and family, operated as a disseizin of Melvin and wife, and that from the continued possession of Kittridge or his lessees, and their occupation, &c., of the demanded premises, as a part of the Cheever farm, and from the fact that every successive grantee occupied them in the same manner, they would pass by the description contained in any of the deeds from Kittridge's heirs,

or any of the subsequent deeds under which the tenants claim ; and that the heirs of both Kittridge and Melvin would be barred.

The demandants contended, 1st. That the mortgage deed, from Benjamin Melvin and wife to Kittridge, did not include the demanded premises. 2d. That the tenants, by producing said mortgage deed, and relying upon it as one ground of their title, were thereby estopped to set up a title, afterwards, by disseizin. 3d. That if the tenants are not so estopped, yet that the facts, as proved, did not constitute a disseizin of Melvin and wife by Kittridge. 4th. But if Melvin and wife were disseized by Kittridge, yet that the tenants had failed to connect themselves with such disseizin by any sufficient and continuous title ; and that the title (if any) acquired by Kittridge or Cheever, by wrong, became extinguished, either by their abandonment of the premises, or by the releases to the demandant. 5th. That the demandant had a right of entry into the demanded premises, when he commenced this suit.

The presiding judge suggested to the counsel, that upon the matter of law which had been raised upon the construction of the various conveyances from the heirs of Kittridge, from Moses Cheever to Thomas M. Clark, from said Clark to Kirk Boott, from said Boott to the Merrimack Manufacturing Company, and the deeds from that company and from Henry Rice to the tenants — he should rule that those deeds were not necessarily to be restricted to the quantity of land actually included in the mortgage from Melvin and wife to Kittridge ; but that, if it should appear to the jury that the land on which Cheever lived, and which was called the Cheever farm, and occupied as such adversely to the demandant and those under whom he claims, did embrace the demanded premises, it was competent for the jury to find the effect of the abovementioned deeds to be such that they might connect the several adverse possessions of the successive grantees as one continuous disseizin. The counsel for the demandant thereupon stated, that under the proposed instructions, there would be no question for the jury, inasmuch as the evidence, as they conceded, showed that there had been an adverse possession in Cheever and the other grantees, for

more than 30 years before the institution of this action ; but they relied upon the effect of the deeds, and the legal construction to be given to them, to show that the disseizins were ineffectual against the demandant, as they were successive and disconnected.  And at the request of the demandant, and with a view to settle, by the jury, the mere question, whether the de manded premises were included in the mortgage of Benjamin Melvin and wife to Jacob Kittridge, the question of disseizin and defence, arising from adverse possession, was taken from the consideration of the jury, the demandant agreeing, that if a verdict should be returned in his favor on the question that was to be submitted to them, the further question, viz. that of defence arising from disseizin, should be reserved for the consideration of the whole court ; and that, if upon all the evidence and all the inferences that a jury might properly draw from the facts proved, the court should be of opinion that it was compe tent for the jury to have found a verdict for the tenants, on the ground of adverse possession and disseizin, then the demandant should become nonsuit.  But if, upon the whole evidence, the court should be of opinion that it would not have been compe tent for the jury to find a verdict for the tenants, upon the ground of disseizin, then that judgment should be entered for the demandant, unless other grounds of defence, taken in the case, show a sufficient bar to his right to recover.

The question whether the demanded premises were included in the mortgage of Melvin and wife to Kittridge, dated April 25th 1782, was submitted to the jury, who found that they were not included therein ; and thereupon the remaining question of disseizin was reserved, upon the terms above stated.

This case was argued at the last October term, before Shaw, C. J. and Justices Wilde and Dewey, by *Greenleaf & G. Parker*, for the demandant, and by *S. Hoar & Robinson*, for the tenants.

The opinion of the three justices, who heard the argument, was delivered at the present term, by

WILDE, J.  This is a writ of entry, wherein the demandant demands possession of a parcel of land in the city of Lowell, of

great value, and consequently the decision of the case is of great importance to the parties ; and the questions to be decided, or some of them, are not free from doubts and difficulties, which we have found on examination somewhat perplexing ; as to which, however, on reflection, taking into consideration all the facts and circumstances of the case and the authorities cited, we have come to a conclusion which we deem correct and satisfactory.

Much evidence was introduced at the trial, as to boundaries and other matters ; and several questions of law and fact were raised, only one of which, however, was submitted to the jury. The title of the tenants was derived from Dr. Jacob Kittridge, who derived his title by a mortgage deed to him from Benjamin Melvin, the father of the demandant ; and the question, whether this mortgage deed included the demanded premises, was left to the jury, who found that it did not. Another important question was, whether the tenants had made out a good title by disseizin ; and this question, by the consent of parties, was reserved for the determination of the court — the demandant admitting that there was proof of an adverse possession in the tenants, and those from whom they claim title, for more than thirty years before the institution of this action ; but they denied that these adverse possessions were so connected by the tenants' title deeds, as to constitute a continuous disseizin ; and this is one of the principal questions submitted to the consideration of the court, upon the legal construction of those deeds. It was fur ther agreed, that if, upon all the evidence and all the inferences that a jury might properly draw from the facts proved, the court should be of opinion that it was competent for the jury to have found a verdict for the tenants, on the ground of adverse possession and disseizin, then the demandant was to become non-suit. This agreement secures to the tenants, substantially, the benefit of a verdict in their favor on this ground of defence. But we do not think much depends on the form of the agreement ; as the questions of law are to be principally, if not wholly, decided upon facts respecting which there is no dispute.

The descriptions in the several deeds are nearly similar, and we do not consider the variance in the language of them as ma-

Melvin *v.* Proprietors of Locks & Canals on Merrimack River.

terial in the decision of the question of their construction. Some of them are deeds of release and quitclaim, and others contain the usual covenants of seizin and general warranty. This difference also we do not consider of much importance. The question depends mainly on the description of the granted or released premises. The land, as conveyed in the deeds from the heirs of Dr. Kittridge to Moses Cheever, is described as follows : A certain share of "about one hundred acres of land, be the same more or less, with the buildings thereon standing, situate in the town of Chelmsford, in the county of Middlesex, being the same estate on which the said Moses Cheever now lives, and which was conveyed by Benjamin Melvin and Joanna Melvin to Dr. Jacob Kittridge, by deed dated the 25th day of April 1782." In some of the deeds, the expression is, "the estate called the Cheever farm" : In others, it is described as "a tract of land on which the said Moses Cheever now lives" : And in all, the deed of Melvin to Kittridge is referred to as a further description of the premises intended to be conveyed.

When these conveyances to Cheever were made, he was in the open and exclusive possession of the demanded premises ; so that, according to the verdict of the jury, the two descriptions do not agree. And the question is, which of them is to be considered, according to the rules of law, as the true description, by which we are to ascertain the estate intended to be conveyed. One of the rules of construction, which has some bearing on the present question, is, that where there is a doubt as to the construction of a deed poll, it shall be taken most favorably for the grantee. If, therefore, there be two descriptions of the land conveyed, which do not coincide, the grantee is entitled to hold by that which will be most beneficial to him. It must, however, be a case of real doubt ; for if one of the descriptions be more certain than the other, the more certain description must govern, although the construction may be less favorable to the grantee. For it is another well known rule in the construction of deeds and other instruments, that if some of the particulars of the description of the estate conveyed do not

agree, those which are uncertain, and liable to errors and mistakes, must be governed by those which are more certain. Thus the boundaries of lands by known monuments are always to control the description by courses and distances; and so courses and distances will control the quantity of land expressed. Another rule of construction is, that if the description be sufficient to ascertain the estate intended to be conveyed, it will pass, although some particular circumstance be added inconsistent with the description. But if the description be general, and a more particular description be added, it will operate by way of restriction. 5 East, 51. 4 Mass. 205. By the application of these well established rules to the present case, we think we may ascertain, with reasonable certainty, the estate intended to be conveyed by the deeds to Cheever.

Several of the cases cited by the counsel seem to be directly in point, but they are not all easily to be reconciled. I will first refer to those cases which seem to support the construction contended for by the counsel for the tenants. In *Worthington* v. *Hylyer*, 4 Mass. 196, the words of description are " all that my farm of land in said Washington, on which I now dwell, being lot No. 17 in the first division." The land demanded in that action was not included in lot No. 17, yet the court held that it passed — the first description being sufficient to ascertain the estate intended to be conveyed — and that the additional description, being inconsistent with the former, was to be rejected; because, if it were to be considered as an essential part of the description, the deed would be void for repugnancy. In *Cate* v. *Thayer*, 3 Greenl. 71, the question was as to one of the lines of the town of Dresden, which was described as a course " north-northeast including the whole of Gardiner's farm ; " and the court held that the whole farm was included, although intersected by a line running north-northeast ; because the farm was to be considered as a monument. In *Keith* v. *Reynolds*, 3 Greenl. 393, the description was, " a certain tract of land or farm, in Winslow, included in the tract which was granted to Ez. Pattee," and afterwards there was added a particular description by courses and distances, which did not include the

whole farm. It was contended that the particular description should prevail, in preference to the other which was more general and uncertain; but it was decided that the first description was certain enough, and that it was to be adopted rather than the description by courses and distances, which was more liable to errors and mistakes. In *Lodge* v. *Lee*, 6 Cranch, 237, the description was, " all that tract or upper island of land, called' Eden ; " and then it was added, " beginning at a maple tree," and describing the land conveyed, by bounds, courses and distances; but so as not to include all the island. The court held that the whole island passed. In *Jackson* v. *Barringer*, 15 Johns. 471, the grant was, " the farm on which J. J. D. now lives," which was bounded on three sides, and " to contain eighty acres in one piece." The farm contained 149 acres ; and the decision was, that the whole farm passed. In *Swyft* v. *Eyres*, Cro'. Car. 546, the land conveyed was described as " all that the grantors' glebe lands lying in Chesterton, viz. 78 acres of land, with all profits, tithes, &c."; and then were added the words, " all which lately were in the ferm or occupation of Margaret Peto." It was found that the tithes of these glebe lands never were in the tenure of Margaret Peto, though other lands and tithes were. But it was held, notwithstanding, that the lands and tithes, first described, passed. In *Eliot* v. *Thatcher*, 2 Met. 44, *note*, the land conveyed was thus described : " All my real property or homestead, so called, lying and being in Dartmouth, together with about 30 acres of land, let the same be more or less, &c. ; for more particular boundaries reference may be had to a deed, given by Clark Ricketson to David Thatcher, of the above mentioned premises." It appeared that the grantor was seized only of a part of the land which he bought of Ricketson, but he had bought some land adjoining thereto, being in the whole about 30 acres. And it was decided that the whole passed ; it being held that the word " homestead " was a sufficiently certain description, and that the grant ought not to be limited and restrained by the subsequent reference to Ricketson's deed ; it being a well known rule of construction of deeds, that a precedent particular de-

3 *

scription shall not be impaired by a subsequent general descrip-
tion or reference ; and that deeds are to be construed accord-
ing to the intention of the parties ; and that if there be any doubt
or repugnancy in the words, such construction is to be made as is
most strong against the grantor, because he is presumed to have
had a valuable consideration for what he parts with.

These cases certainly are strongly in favor of the construction
of the deeds in question, which is contended for by the tenants'
counsel.

But in the case of *Barnard* v. *Martin*, 5 N. Hamp. 536,
and in *Woodman* v. *Lane*, 7 N. Hamp. 241, a different rule of
construction was adopted.   In the former case, the grant was
"my homestead farm, it being the same land conveyed to me
and J. M. by C. B.," which did not in fact include the whole
homestead farm ; and it was decided that the former description
was controlled by the latter.   In the other case, the grant was,
" my homestead farm, and is the same land which was conveyed
to me by the deeds of" [several persons named,] " for a more
particular description reference may be had to said deeds ; " and
the same decision was had as in the former case.   See 8 East,
103.   Plowd. 191.

The weight of authority, however, is we think clearly in favor
of the former decisions.

In the present case, if the land had been conveyed by refer-
ance to known monuments and boundaries, it would be clear
that the subsequent reference to the mortgage deed would not
operate by way of restriction ; and we think there is no good
reason why the description in these deeds—the boundaries of the
farm conveyed being certain, and undoubtedly well known to
the parties — should not be held equally conclusive.   There
are also several extraneous circumstances, which favor this con-
struction.   In 1793, Kittridge made a lease of the premises to
Melvin, in which they were particularly described by metes and
bounds ; and the presumption is, that a survey had been taken
after the mortgage deed had been given ; for the description of
the premises in that deed is very general and loose.   This lease,
taken in connexion with the subsequent leases to Cheever, must

be construed so as to include the demanded premises. The description is similar, except that the lease to Cheever, in 1803, bounds the premises on Tyler. There is in this lease also a mistake in the length of one of the lines ; but taking the description all together it is sufficiently clear, and the mistake in the line is obvious from the monuments and abuttals referred to in the subsequent part of the description. Then it appears that after Melvin's lease had expired, he was sued by Kittridge, who recovered judgment against him for possession, in 1796, and immediately took possession and leased the premises to Cheever and Thissell ; and that Cheever built a fence on the Tyler line, and occupied up to that line. The description of the premises, in Kittridge's writ, may not be sufficiently certain to be conclusive against Melvin ; but there can be no doubt that the parties well understood what land was sued for in that writ. These facts raise a strong presumption that the mortgaged premises were located by the parties according to the tenants' claim. Melvin acquiesced, never making any claim, until his death in 1830. And in the meantime he conveyed his lands to Tyler and others up to the line to which the tenants now claim. These circumstances must have been well known to the heirs of Dr. Kittridge, when they conveyed to Cheever ; and if so, they certainly ought to have a controlling influence in ascertaining the intention of the parties to those conveyances.

And the strong presumption is, that the heirs intended to convey and relinquish all their right and title to the Cheever farm, however it might have been acquired. No other reasonable inference can be made from the language of the deeds and the facts proved. And this presumption is much strengthened by the conduct of the parties since the conveyance. The long acquiescence of the heirs in the possession of Cheever, and those to whom he conveyed the premises, taking into consideration their greatly increased value, is a strong circumstance to show that the parties supposed that the whole farm had been conveyed. Upon the whole, therefore, we can have no doubt as to the intention of the parties ; and we think there is no technical rule of law, as to the construction of deeds, that

should deprive the grantee of any part of the land intended to be conveyed, and for which, it must be presumed, he paid a valuable consideration. We have no doubt that the parties believed, and had good reason to believe, that all the Cheever, farm, as it was called, was included in the mortgage deed; but if it was not, the mistake is not to prejudice the grantee, in favor of the grantors. We are therefore of opinion, upon the whole matter, that all the title of the heirs of Dr. Kittridge to the Cheever farm passed by their conveyances, whether it was derived from the mortgage deed, or was acquired by disseizin.

But supposing we should adopt the construction contended for by the demandant's counsel, still the question would remain, whether the tenants have not made out a good title. Admitting this construction, the objection is, that the heirs of Melvin, who entered on the premises in 1832, had a good right of entry, because Cheever's possession, after the death of Dr. Kittridge, was less than 20 years; and this is unquestionably so, unless the possession of Kittridge and Cheever were so connected as to have kept up a continuous disseizin. For it is a principle well established, that where several persons enter on land in succession, the several possessions cannot be tacked, so as to make a continuity of possession, unless there is a privity of estate, or the several titles are connected. Whenever one quits the possession, the seizin of the true owner is restored, and an entry afterwards by another, wrongfully, constitutes a new disseizin; as was decided in *Potts* v. *Gilbert*, 3 Wash. C. C. 475. And the same principle is laid down in *Ward* v. *Bartholomew*, 6 Pick. 415; in *Brandt* v. *Ogden*, 1 Johns. 158; in *Doe* v. *Campbell*, 10 Johns. 475; in *Jackson* v. *Leonard*, 9 Cow. 653; and in *Allen* v. *Holton*, 20 Pick. 465.

But in the latter case it was decided, that where one of two disseizors, in possession as tenants in common, abandons the land, the abandonment does not enure to the benefit of the disseizee, but the cotenant holds the land against the disseizee, in the same manner as if he had been from the beginning a sole disseizor. No conveyance of the moiety held by the other disseizor is necessary, and the disseizee cannot regain his seizin,

except by entry or action ; for he cannot hold jointly, or in common, with the disseizor. The same principle seems to be applicable to the present case. While Cheever's lease conr tinued in force, there was a privity of estate between him and Dr. Kittridge, his lessor ; and so there was between him and the heirs of Kittridge, after his death, if he occupied with their consent, as a tenant at will. It is said, however, that there is no privity of estate between the owner of land and a tenant at sufferance. But whether Cheever was a tenant at sufferance, or tenant at will, there was such a connexion of title between him and Kittridge and his heirs, as would be sufficient to preserve the continuity of the disseizin.

The next objection to the tenants' title is, that Kittridge entered by mistake as to the boundaries of the mortgage deed, and that such an entry would not constitute a disseizin ; or if it would, that as the tenants relied on the mortgage, as one grour.d of their title, they are estopped to set up a title by disseizin. We think there is no good ground for this objection, in either branch of it. As to the supposed mistake, the demandant cannot now set up the objection ; for by the report it appears, that his counsel admitted that thirty years of adverse possession had been proved ; and adverse possession, without right, constitutes a disseizin, provided the possession be notorious and exclusive. But if there had been no such admission, there is nothing in the case reported to support the objection. For Kittridge entered in 1796, under his judgment. He entered, therefore, under a title hostile to that of Melvin ; and if his title was not good, the entry and expulsion of Melvin clearly constituted a disseizin. If one enters under a void grant, he is a disseizor.

The only other question which remains to be decided is, whether the right of Mrs. Melvin, the mother of the demandant, has been barred. The argument is, that if the demanded premises were included in the judgment which Kittridge recovered against Melvin, neither he nor his wife had any right to enter ; and therefore their neglecting to enter would not bar her right. To this argument there are several objections. In the first place, the premises are not described with sufficient certainty to

bar Melvin's title, if he had a good title to a part of the premises before the judgment. To make the judgment conclusive, as to the extent of the land recovered, it must be described, in the writ or judgment, with great certainty; otherwise the sheriff cannot know of what land he is to deliver possession on the writ of *habere facias possessionem*. And if he delivers more than is described in such writ, an action upon the case will lie against him. It is important, therefore, that the land should be described with great accuracy and certainty. The sheriff is not to be called upon to give a construction to a vague or inconsistent description. This is within the province of the court alone to determine. A description of land, though inconsistent in some respects, may be sufficiently certain to pass the estate intended to be conveyed, but not sufficiently certain to be a good foundation for a conclusive judgment. The grant of all a man's lands in a town, county or state, would be sufficiently certain to pass a title to his lands; but such a description would not be sufficient in a writ of *habere facias possessionem*.

But supposing Melvin's right of entry was barred by the judgment, it does not follow that his wife could not enter to prevent her right from being barred by the statute of limitations. An estate in remainder or reversion may be taken in execution, and the officer may enter for the purpose of delivering seizin to the judgment creditor, without being a trespasser upon the tenant of the particular estate. And for a like reason, the wife of Melvin, he not objecting, might make a formal entry on the land, (though *he* could not,) for the purpose of preventing the statute bar.

And lastly, another and a decisive answer to the argument of the counsel for the demandant is, that the statute of limitations is express and clear, that when a right of entry into any lands, tenements or hereditaments, accrues to a feme covert, her right of entry is barred, unless she enters within thirty years from the time her right of entry first accrued; as was decided between these same parties, in 16 Pick. 161. This may have been an unwise law, and it has been since altered by the Rev Sts. c. 119, § 5. But the language of *St.* 1786, *c.* 13, is clear,

and must govern the present case.   We think it has been clearly proved, that Mrs. Melvin was disseized as early as 1796, and neither she nor her heirs ever entered before 1832.   They had then no right of entry, and have never been lawfully seized.

We are therefore of opinion that the tenants have made out a good title to the whole premises, on the grounds stated, and are entitled to judgment.